IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 26, 2011

## OMOWALI ASHANTI SHABAZZ, aka FRED EDMOND DEAN
## v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. S36021, S36114      R. Jerry Beck, Judge**

_____

**No. E2010-01639-CCA-R3-PC - Filed July 15, 2011**

_____

In June 2010, the Petitioner, Omowali Ashanti Shabazz, aka Fred Edmond Dean, filed a
petition for writ of error coram nobis challenging his conviction for second degree murder.
The Petitioner alleged that he was prejudiced by the State's failure to disclose a "rent receipt"
earlier in the trial proceedings and by the trial court's failure to include a jury instruction on
the term "residence" or, alternatively, that counsel was ineffective by failing to request a jury
instruction on the term "residence" or pursue the issue on appeal. The coram nobis court
summarily dismissed the petition on the basis that any relief was time-barred and that the
Petitioner had failed to state a cognizable claim for relief. Following our review of the
record, we affirm the judgment of the Sullivan County Criminal Court summarily denying
relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, SP. J., delivered the opinion of the Court, in which THOMAS T. WOODALL
and JOHN EVERETT WILLIAMS, JJ., joined.

Katherine L. Tranum, Kingsport, Tennessee, for the appellant, Omowali Ashanti Shabazz,
aka Fred Edmond Dean.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney
General; and H. Greeley Wells, Jr., District Attorney General.; for the appellee, State of
Tennessee.

# OPINION
## Factual Background

This case presents a protracted procedural history. The facts underlying the convictions at issue in this case were summarized by this Court on direct appeal as follows:

[O]n April 1, 1994, Karen Stiltner was in the process of moving out [sic] the apartment she had shared with [the Petitioner] since late January of 1994. [The Petitioner] had already moved out of the apartment in early March, informing both the apartment owner and his employer of his move. Although the lease on the apartment terminated at the end of March, the apartment owner had given Ms. Stiltner until April 2 to move out.

On the morning of April 1, Ms. Stiltner arrived at the apartment at approximately 11:00 a.m. She spent the day packing her belongings. Later that afternoon, David Orfield, Ms. Stiltner's boyfriend, arrived at the apartment to assist with the move. At approximately 6:00 p.m., [the Petitioner] arrived at the apartment, carrying with him his .20 gauge shotgun. He asked Ms. Stiltner to remove her belongings by that night. Ms. Stiltner responded that the apartment owner had given her until April 2 to move out and that she might have to return the following morning to complete the move. Ms. Stiltner and Mr. Orfield then left the apartment with a load of Ms. Stiltner's belongings.

A short time later, Ms. Stiltner and Mr. Orfield returned with Michelle Lubecke to retrieve another load. [The Petitioner] again requested that Ms. Stiltner remove her belongings by that night, and, according to Ms. Lubecke, threatened to kill anyone that returned to the apartment. The group then left with another load of Ms. Stiltner's belongings.

After the group had departed, [the Petitioner] made a visit to the apartment owner in an effort to re-rent the apartment by himself. The apartment owner agreed to hold the apartment for [the Petitioner] for a few weeks until he was ready to move in but told him that Ms. Stiltner had until April 2 to leave the apartment. [The Petitioner] then returned to the apartment and began moving Ms. Stiltner's belongings out of the apartment onto the porch. Without the permission of the apartment owner, [the Petitioner] changed the lock on the door of the apartment. He then left to get something to eat with a female companion.

Accompanied by Mr. Orfield, Ms. Lubecke, and Stewart Harkleroad, Ms. Lubecke's boyfriend, Ms. Stiltner returned to the apartment for one last load. Upon arrival, the group was unable to enter the apartment because of the new lock. In order to gain access, Mr. Harkleroad kicked the door open. The group then proceeded into the apartment and continued with the move.

As Mr. Orfield and Mr. Harkleroad attempted to move a dresser through the front door, [the Petitioner] returned to the apartment, still carrying his shotgun. [The Petitioner] became very angry and demanded that everyone leave the apartment. When the two men refused to leave, [the Petitioner] began swinging his shotgun by the barrel, striking Mr. Orfield in the back with the stock of the gun. In response, Mr. Orfield and Mr. Harkleroad forced [the Petitioner] against a wall and took away his gun. Mr. Harkleroad determined that the gun was unloaded and leaned it against the wall. Mr. Orfield and Mr. Harkleroad returned to the dresser, and [the Petitioner] left the room. A short time later, [the Petitioner] emerged from the kitchen with an iron skillet and again demanded that the two men leave. Mr. Harkleroad reached into his pocket but, at the request of Ms. Lubecke, never removed the pocketknife that he kept there.

Despite [the Petitioner's] angry demands, Mr. Orfield and Mr. Harkleroad refused to leave the apartment and again returned to the dresser. At this point, [the Petitioner] retrieved and loaded his shotgun. Mr. Orfield noticed [the Petitioner] pointing the shotgun at them, and just before [the Petitioner] fired, ducked out of the way. Mr. Harkleroad was struck in the chest by the shotgun blast. At the time of the shooting, Ms. Stiltner was in the kitchen packing groceries, and Ms. Lubecke was in the hallway outside the apartment. Immediately following the shot, all four individuals, including the injured Mr. Harkleroad, fled the apartment. [The Petitioner], still carrying his shotgun and making threats, followed the group out of the apartment.

When he reached the front yard, Mr. Harkleroad collapsed face-down, where Ms. Lubecke attempted to come to his aid. Mr. Orfield ran to a neighbor's house to seek help, and Ms. Stiltner sought cover between two vehicles. Having heard the commotion, Natasha Newton, a downstairs neighbor, came out of her apartment to investigate. From approximately five feet away, [the Petitioner] again fired his weapon in the direction of Ms. Stiltner, just missing her head. [The Petitioner] then fled the scene. Mr. Harkleroad was eventually transported to the emergency room where he was pronounced dead.

Following the shooting, [the Petitioner] proceeded to his parents' home. Accompanied by his father, [the Petitioner] then turned himself into authorities. [The Petitioner] was arrested and charged by presentment with first degree murder and attempted first degree murder in violation of Tennessee Code Annotated Section 39-13-202(a)(1). From January 24, 1995 through January 27, 1995, [the Petitioner] was tried before a jury in the Sullivan County Criminal Court. At trial, [the Petitioner] alleged that, at the time of the shooting, he had been maintaining a residence at the apartment for the last few weeks while Ms. Stiltner lived elsewhere. He further alleged that Mr. Harkleroad threatened him with a knife just before the shooting.

At the conclusion of the trial, the jury found [the Petitioner] guilty of second degree murder and attempted second degree murder.

State v. Fred Edmond Dean, No. 03C01-9508-CC-00251, 1997 WL 7550, at *1-3 (Tenn. Crim. App., Knoxville, Jan. 10, 1997), perm. to appeal denied, (Tenn. Sept. 2, 1997). The trial court sentenced the Petitioner as a Range II, multiple offender to thirty years for the second degree murder conviction and fifteen years for the attempted second degree murder conviction. These sentences were ordered to be served consecutively to one another. The Petitioner then appealed his convictions and sentences to this Court, and we affirmed the judgments of the trial court. See id.

In July 1997, the Petitioner filed a petition for post-conviction relief. See Fred Edmond Dean, aka Omawali Ashanti Shabazz, v. State,[1] No. E1998-00135-CCA-R3-PC, 2000 WL 337552 (Tenn. Crim. App., Knoxville, Mar. 21, 2000), perm. to appeal denied, (Tenn. Nov. 13, 2000). The Petitioner argued, among other things, that his trial and appellate counsel were ineffective due to their failure to object to or appeal the jury instruction with regard to the range of punishment for attempted first degree murder and its lesser-included offenses and that the post-conviction court erred in failing to find that a lost rent receipt constituted a Brady[2] violation that entitled him to relief. See id. at *3, 7. Following an evidentiary hearing, the post-conviction court denied relief. See id. at *1. On appeal, this Court granted relief with respect to the Petitioner's attempted second degree murder conviction based upon the erroneous sentencing instruction and vacated the conviction. See id. at *3-7. Regarding the receipt issue, this Court determined that the issue was waived. See

---

[1] The Petitioner appears to have changed his name while in prison. For the sake of clarity, we note that Fred Edmond Dean and Omawali/Omowale/Omowali Ashanti Shabazz all appear to be the same individual.

[2] Brady v. Maryland, 373 U.S. 83 (1963).

id. at *7. Our supreme court affirmed our decision to vacate the attempted second degree murder conviction. See Dean v. State, 59 S.W.3d 663 (Tenn. 2001). Following the post-conviction appeal, the attempted second degree murder conviction was remanded to the trial court, and the Petitioner pleaded guilty to a lesser-included offense of aggravated assault on July 18, 2002. He was sentenced to six years for the aggravated assault conviction, to be served consecutively to the thirty-year sentence for second degree murder. A judgment form for this conviction was filed on August 2, 2002.

Thereafter, the Petitioner filed a habeas corpus petition, which was summarily dismissed for failure to comply with procedural requirements. On appeal, this Court affirmed the dismissal of that habeas corpus petition. See Omowale A. Shabazz v. Jim Worthington, Warden, No. E2007-00634-CCA-R3-HC, 2007 WL 2984694 (Tenn. Crim. App., Knoxville, Oct. 15, 2007), perm. to appeal denied, (Tenn. Jan. 28, 2008). The Petitioner then filed a habeas corpus petition in Morgan County, challenging the constitutionality of the second degree murder statute and the definition of "knowing" as given by the trial court. See Omowale A. Shabazz, aka Fred Edmond Dean, v. James Worthington, Warden, No. E2008-01627-CCA-R3-HC, 2009 WL 348297, at *1 (Tenn. Crim. App., Knoxville, Feb. 11, 2009), perm. to appeal denied, (Tenn. Aug. 31, 2009). Following summary dismissal of the petition, this Court affirmed in accordance with Rule 20, Rules of the Court of Criminal Appeals. See id.

On June 24, 2010, the Petitioner filed the instant petition for writ of error coram nobis challenging his second degree murder conviction.[3] The Petitioner acknowledged that the statute of limitations period had expired but argued that the limitations period should be tolled due to his "actual innocence." He further asserted the following grounds for relief: (1) the trial court failed to include a jury instruction defining the word "residence"; (2) he was denied the effective assistance of counsel due to trial counsel's failure to object to the lack of jury instruction on the term "residence" and his appellate counsel's failure to raise the issue on direct appeal; and (3) the State failed to timely disclose Brady material, the "rent receipt," which if located earlier during the trial, would have been useful in cross-examination of the landlord.

Upon motion by the State, the coram nobis court dismissed the petition because it was untimely filed. The court further found that the Petitioner neither raised a cognizable coram

---

[3] He did not take issue with his aggravated assault conviction.

nobis claim nor alleged any newly discovered evidence.  An extensive order to that affect was signed by the judge on July 15, 2010.[4]  The case is now before this Court.[5]

## Analysis

On appeal, the Petitioner argues that he is entitled to error coram nobis relief because the trial court erred in failing to instruct the jury on the term residence, trial counsel was ineffective in failing to request such an instruction and appellate counsel should have raised the issue on appeal, and the delayed disclosure of the "rent receipt" denied the defense an opportunity to confront the landlord with that evidence, possibly affecting her credibility in the eyes of the jury.  The Petitioner submitted that due process required tolling of the limitations period because he had been denied the opportunity to have his jury instruction issue heard in "meaningful time and place."

A writ of error coram nobis is available to a defendant in a criminal prosecution. Tennessee Code Annotated section 40-26-105 provides, in pertinent part, as follows:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.  Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

> (c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105.

---

[4] While the parties state the order was filed on the same date that it was signed, the "file-stamp" date on the copy in the appellate record is not legible.

[5] On July 20, 2010, the Petitioner filed a motion to alter or amend the judgment, which was denied that same day, and counsel was appointed to represent the Petitioner on appeal. A notice of appeal was filed on August 16, 2010.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 375.

To establish that he is entitled to a new trial, the Petitioner must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. Freshwater, 160 S.W.3d at 553; Hart, 911 S.W.2d at 374-75.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the Petitioner also establishes that the Petitioner was "without fault" in failing to present the evidence at the proper time.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003). To be successful on a petition for a writ of error coram nobis, our supreme court recently held that "the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome . . . ." State v. Vasques, 221 S.W.3d 514, 526 (Tenn. 2007).

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. Tenn. Code Ann. §§ 27-7-103, 40-26-105; Mixon, 983 S.W.2d at 671. In this case, the Petitioner was convicted by a jury in January 1995 of second degree murder. This Court affirmed his second degree murder conviction on January 10, 1997, and our supreme court denied permission to appeal on September 2, 1997. The parties do not dispute that the statute of limitations, if not tolled, expired years before the filing of the instant petition.

The Freshwater case is instructional on whether the statute of limitations should be tolled in a particular case:

In State v.Workman, 41 S.W.3d 100 (Tenn. 2001), the supreme court found that, in a variety of contexts, due process may require tolling of an applicable statute of limitations. Id. at 103. The Workman court relied, in part, on the due process considerations discussed in Burford v. State, 845 S.W.2d 204 (Tenn. 1992). Workman, 41 S.W.3d at 102. Specifically, the Burford court recognized that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner" and that, "under the circumstances of a particular case, application of the statute may not afford a reasonable opportunity to have the claimed issue heard and decided." Id. (quoting Burford, 845 S.W.2d at 208).

In determining what sort of opportunity is "reasonable," the court concluded that "identification of the precise dictates of due process requires consideration of both the governmental interests involved and the private interests affected by the official action . . . ." Workman, 41 S.W.3d at 102. In Burford, the private interest at stake was the accused's opportunity to attack his conviction and incarceration on the grounds that he was deprived of a constitutional right via a post-conviction petition; the governmental interest represented by the statute of limitations was the prevention of stale and groundless claims. Id. The court in Burford determined, after weighing the competing interests in that case, that the accused's interest in mounting a constitutional attack upon his conviction and incarceration outweighed the State's interest in preventing the litigation of stale and groundless claims.

Using that same analysis, the court in Workman weighed the governmental interests involved against the private interests affected by the official action and decided that, if the procedural time bar was applied, Workman could have been put to death without receiving an opportunity to have the merits of his claim evaluated by a court of this state. Id. at 103. In other words, the court determined that due process precludes application of the statute of limitations to bar consideration of a petition for writ of error coram nobis in cases where the defendant's interest in obtaining a hearing to present newly discovered evidence, which may establish actual innocence, far outweighs any governmental interest in preventing the litigation of stale claims. Id. The supreme court concluded that Workman was entitled to a hearing to evaluate the claims contained in his petition for writ of error coram nobis, notwithstanding the fact that he filed his petition thirteen months after discovering the newly discovered evidence. Id. In considering the delay, the

-8-

court remarked that the time within which Workman's petition was filed did not exceed the reasonable opportunity afforded by due process, especially in cases such as Workman's where the evidence in issue may show actual innocence of a capital offense. Id. at 103-04.

Freshwater, 160 S.W.3d at 556-57. This Court has also applied the doctrine set forth in Workman to non-capital cases. See Freshwater, 160 S.W.3d at 557 (sentence of ninety-nine years); State v. Ratliff, 71 S.W.3d 291, 296-97 (Tenn. Crim. App. 2001) (sentence of twenty-four years without parole). The thirty-year sentence in this case is a sufficiently significant period of time to warrant a due process analysis.

To determine whether due process requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. Workman, 41 S.W.3d at 103. In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run;

> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and

> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010) (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)).

In the case sub judice, the Petitioner presents three basic claims for relief. First, he argues that the trial court erred by failing to instruct the jury on the term "residence." He then argues that trial counsel was ineffective in failing to request a jury instruction on the term "residence," as said definition was critical to his defense, and that appellate counsel was ineffective for failing to raise the issue. Finally, he phrases his argument about the "rent receipt" in terms of a Brady violation and contends that the withholding of that receipt until late into his trial denied him his right to confront the landlord with the receipt and impeach her credibility.

The coram nobis court summarily dismissed the petition finding that the "statute of limitations has long run." The court also concluded that "the issues raised are not embraced

to the writ of error coram nobis statues" and that "the [P]etitioner has not presented any allegations of newly discovered evidence."

## I. Jury Instruction and Ineffective Assistance Claim

The Petitioner argues that, at the time of his trial in 1995, the trial court erred by failing to include a definition of the term "residence" in its charge to the jury. He submits that a writ of error coram nobis "is the proper vehicle to present the jury instruction issue" because "[t]his issue, in 1995, was so novel that its legal basis was not reasonably available to counsel at the time of [the Petitioner's] original trial and could not have been litigated at trial, on motion for new trial, on appeal in nature or writ or error or in a habeas corpus proceeding."[6] The Petitioner then acknowledges that "there was no law that required residence to be defined, nor could the trial judge anticipate changes in the law"; despite this acknowledgment, he nonsensically continues that, because the Petitioner's residency was "a hotly contested issue in the original trial" and because "it was a fact in dispute, it was error not to define what constituted a residence in Tennessee." He further frames the issue in terms on ineffective assistance of counsel: "And it was ineffective assistance of trial and direct appeal counsel not to preserve this issue for appellate review, or to request a supplemental instruction defining what constituted a residence in this State."

We conclude that any issue regarding the propriety of the jury instruction regarding the definition of "residence" would not constitute "newly discovered evidence." See George Langford v. State, No. W2006-02765-CCA-R3-PC, 2008 WL 1700228, at *3 (Tenn. Crim. App., Jackson, Apr. 7, 2008) ("Nor do . . . allegations of improper jury instructions 'amount to new evidence of innocence which would have resulted in a different judgment had it been presented at trial.'") (citing Freshwater, 160 S.W.3d at 556); Yasmond Fenderson v. State, No. E2003-02995-CCA-R3-PC, 2004 WL 1488552, at *2 (Tenn. Crim. App., Knoxville, July 1, 2004). Moreover, we note that ineffective assistance of counsel is not an appropriate ground for relief pursuant to a writ of error coram nobis. See Daniel Lee Draper v. State, No. E2009-00952-CCA-R3-PC, 2010 WL 5343193, at *5 (Tenn. Crim. App., Knoxville, Dec. 21, 2010), perm. to appeal denied, (Tenn. Apr. 13, 2011); Domingo Ponce v. State, No. M2004-02257-CCA-R3-CO, 2005 WL 1303125, at *3 (Tenn. Crim. App., Nashville, May 31, 2005). Any challenge to the jury instructions could have been raised on direct appeal or in a post-conviction petition, and allegations of ineffective assistance of counsel are more appropriately addressed in a petition for post-conviction relief.

---

[6] The Petitioner argues that the State waived any argument on this issue because it did not respond to this claim in its response to the Petitioner's coram nobis petition. However, despite this being true, the coram nobis court squarely addressed the issue in its order.

The Petitioner has previously filed a petition for post-conviction relief that was resolved on the merits. See Dean, 59 S.W.3d 663; Dean, 2000 WL 337552. The 1995 Post-Conviction Procedure Act does not contemplate the filing of more than one petition for post-conviction relief, see Tennessee Code Annotated section 40-30-102(c), and the Petitioner has not satisfied the prerequisites to reopening his prior petition, see Tennessee Code Annotated section 40-30-117. Accordingly, insofar as the Petitioner's pleading may be considered as a petition for post-conviction relief, it was properly dismissed without a hearing.

The Petitioner asserts that he raised the jury instruction issue in his post-conviction petition but that the post-conviction court never ruled on this issue despite a request to do so by post-conviction counsel at his hearing. He elaborates that the post-conviction court's failure to rule on the issue resulted in this Court "erroneously ruling that the issue had been waived, even though the issue of defining the word residence was presented in the context of a Sixth Amendment ineffective assistance of counsel claim, which was meant to rebut the presumption of waiver." He then submits that the coram nobis statue of limitations should be tolled because he "has never been given a reasonable opportunity to have this issue heard and decided, nor is the government's interest in administrative efficiency and economy sufficient to override" the Petitioner's interests.

In the post-conviction order, the post-conviction court made the following statement when outlining the issues before the court: "The [P]etitioner originally filed a rambling thirty-three page pro se petition plus other pro se motions. Prior to hearing, counsel had narrowed the issues to be presented and those issues are set out below." The order did not include any analysis of the jury instruction issue now presented by the Petitioner. The Petitioner attached to his brief a copy of a pro se amended petition for post-conviction relief, which included the issue.[7] At the post-conviction hearing, the Petitioner was asked if he had any additional issues for the court to consider, and he made some vague reference to "more issues he wanted raised" and a recently filed "amended brief" wherein he raised the broad issue of ineffective assistance of counsel at trial and on appeal. The Petitioner did raise a jury instruction issue in his post-conviction petition, i.e., that his trial and appellate counsel were ineffective due to their failure to object to or appeal the jury instruction with regard to the range of punishment for attempted first degree murder and its lesser-included offenses, which was addressed by the post-conviction court, this Court, and our supreme court. Ultimately, he was granted relief, and his conviction for attempted second murder was vacated due to the erroneous sentencing instruction.

---

[7] This document reflects a "file-stamp" but it is not certified by the clerk of the coram nobis court. If we assume the document's authenticity, it appears that the document was filed ten days before the post-conviction hearing.

Contrary to the assertions of the Petitioner,[8] it does not appear that this Court addressed the current issue in our opinion on the Petitioner's post-conviction appeal, presumably because it was not raised. The Petitioner did argue in his post-conviction appeal that "the post-conviction court erred in failing to rule upon all the issues he raised[,]" citing to two specific issues, neither of which relates to the current jury instruction issue. The Petitioner presented the issue of self-defense on direct appeal and raised several jury instruction issues in his post-conviction appeals, none of which included the current issue. This issue could have been raised at any time in his direct appeal or post-conviction proceedings. The post-conviction court's order reflects that Petitioner's counsel apparently chose to focus on a couple of more meritorious issues, rather than the full gambit of issues raised in the Petitioner's "rambling thirty-three page pro se petition plus other pro se motions." The Petitioner has failed to point to "new" evidence of actual innocence within the meaning of the coram nobis statute. The Petitioner is seeking one more bite of the proverbial apple, and we cannot conclude that due process so requires.

Even if we accept that the Petitioner's claims were "later-arising," our supreme court issued its opinion on the petition for post-conviction relief on October 30, 2001, and the Petitioner entered a guilty plea to aggravated assault, as a lesser-included offense of the attempted second degree murder conviction, in July 2002. Thus, at the latest, his post-conviction proceedings concluded with his guilty plea, approximately eight years before he filed the instant petition. The opportunity to assert a coram nobis claim was entirely within the Petitioner's control after July 2002, and nothing prevented him from filing a separate coram nobis action. See Harris, 301 S.W.3d at 147.

Nonetheless, we briefly note the findings of the coram nobis court addressing the merits of the issue. The court noted that the issue of self-defense, including the defense of one's residence, was raised in the Petitioner's trial. The jury charge included full instructions on self-defense and defense of one's residence, tracking the language of the pattern instructions applicable at the time of the offense. Although the self-defense statute, and by extension the pattern instructions, were amended some years later to include a definition of residence, see Tennessee Code Annotated section 39-11-611, the instructions, as given, contained a fair and accurate statement of the law at the time of the Petitioner's trial in 1995. Further, the issues of sufficiency of the evidence and self-defense were raised on direct

---

[8] The Petitioner later admits in his brief that this issue was not raised on appeal from denial of his post-conviction petition. However, he goes on to state that the issue was again raised before our supreme court and that the supreme court denied permission to appeal on the issue. This is directly contrary to our supreme court's issuance of an opinion on the Petitioner's post-conviction appeal. See Dean, 59 S.W.3d 663. The Petitioner further claims that a federal habeas corpus court determined that the issue was procedurally defaulted.

-12-

appeal. <u>Dean</u>, 1997 WL 7550, at *4-6. The Petitioner has not shown that the failure of the trial court to give a jury instruction, adopted after the Petitioner committed the offense, was error. The coram nobis court concluded that this claim "does not fall within the scope or purpose of the writ of coram nobis law."

## II. <u>Brady</u> Violation

The Petitioner alleges that the State violated his constitutional rights under <u>Brady v. Maryland</u> by failing to provide the "rent receipt" earlier in the trial. The Petitioner specifically references the testimony of his "landlady," Lora Jean White. Ms. White testified at trial regarding the rental status of the property where the offense took place, and she was cross-examined by defense counsel. Ms. White testified that the Petitioner had only paid a "hold deposit" for the apartment, not rent. Lieutenant Jack Necessary of the Bristol Police Department stated that he found a jacket at the scene, which contained a receipt in one of its pockets. The receipt could not be located prior to trial. According to Ms. White, she agreed to hold the apartment for the Petitioner for a few weeks until he was ready to move in but told him that Ms. Stiltner had until April 2 to leave the apartment. Ms. White stated that the holding money would become deposit money when the Petitioner moved in. After Ms. White testified, she was released from her subpoena. Later the jacket found by Lt. Necessary was sent to the jury as an exhibit, and a juror located the receipt in the pocket. The Petitioner argued that this receipt directly contradicted Ms. White's testimony and called into question her credibility. The Petitioner asserted that the receipt supported his claim that he was living in the apartment. According to the Petitioner, the trial court denied his request for a continuance to recall Ms. White to testify, in violation of his due process rights.

A petition for a writ of error coram nobis may be an appropriate remedy by which to seek relief from constitutional errors such as that asserted under <u>Brady v. Maryland</u>. <u>Freshwater</u>, 160 S.W.3d at 555-556. Under <u>Brady v. Maryland</u>, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87. Evidence that is favorable to an accused includes proof that may be used to impeach the prosecution's witnesses. <u>State v. Copeland</u>, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing <u>Giglio v. United States</u>, 405 U.S. 150 (1972)). However, "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).

Thus, a criminal defendant must satisfy the following four prerequisites in order to demonstrate a due process violation under <u>Brady v. Maryland</u>:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a Brady violation by a preponderance of the evidence. Id. "The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial." Id.

The coram nobis court made the following findings relevant to this issue. The Petitioner raised the issue of the "rent receipt" in his petition for post-conviction relief filed on July 10, 1997. The post-conviction court directly addressed the issue. The coram nobis court cited to the following findings of the post-conviction court:

1. The [P]etitioner, in his pre-trial motion, requested Brady-type materials, but did not specifically describe a "receipt." The [P]etitioner asked to inspect all things taken from the [D]efendant/[P]etitioner.

2. The police did not turn the receipt over to the district attorney. The rent receipt was lost but not intentionally lost or kept from the [P]etitioner. The receipt was turned over to the defense during the trial and introduced as an exhibit at the original trial.

3. The rent receipt would have been favorable to the [Petitioner] in that it confirmed he had paid his landlord $160 on the day of the killing.

4. There is not [sic] indication from a review of the naked receipt that the receipt was a rent receipt, deposit receipt or holding money receipt. Further, there is not [sic] indication that the receipt would be a valuable impeachment tool.

5. Upon a review of the testimony of Lora J. White and the rent receipt, this court is of the opinion that the receipt would not have been material as defined by Edgin, 902 S.W.2d at 390 or Kyles v. Whitley, 514 U.S. 419, 434-35 (1995).

-14-

6. The [P]etitioner has failed to establish that he is entitled to post-conviction relief upon this issue.

On appeal to this Court, we determined that this issue was waived because "[t]he Petitioner did not present these issues at any previous proceedings in which they could have been raised, and he did not set forth any reasons to explain why he failed to present these issues." Dean, 2000 WL 337552, at *7. Presumably, this Court was speaking of the Petitioner's failure to raise this issue on direct appeal as the receipt was discovered during the trial.

The Petitioner has had a reasonable opportunity to present this claim at an earlier time and has, in fact, done so. This matter has been previously litigated. Obviously, the rent receipt does not constitute newly discovered evidence for the purpose of error coram nobis. Moreover, any error on the part of the trial court in failing to allow the defense time to recall Ms. White could have been raised in conjunction with this claim.[9]

We conclude that the pleadings do not present a legal basis for overcoming the State's assertion of the statute of limitations. Furthermore, we agree with the rationale provided by the coram nobis court in its extensive and thorough order. We conclude that the Sullivan County Criminal Court did not err or abuse its discretion by summarily dismissing the petition.

## CONCLUSION

Based on our review of the record, the parties' briefs, and the applicable law, we conclude that summary dismissal of the petition for writ of error coram nobis was proper. Accordingly, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, SPECIAL JUDGE

---

[9] In the order of the post-conviction court, the court noted that the Petitioner claimed "it was impossible to obtain Ms. White for further cross-examination."